

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



**SEALED**

| | |
|---|---|
| UNDER SEAL, | ) Case No.: 3-10 CV 0487 D |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) FIRST AMENDED COMPLAINT FOR |
| | ) VIOLATIONS OF FALSE CLAIMS |
| vs. | ) ACTS 31 U.S.C. §§ 3729, *et seq.* AND |
| | ) Tex. Hum. Res. Code § 36.001 *et* |
| UNDER SEAL, | ) *seq* |
| | ) |
| Defendants. | ) JURY TRIAL DEMANDED |
| | ) |
| | ) |
| | ) **LODGED UNDER SEAL** |
| | ) **PURSUANT TO 31 U.S.C. §§** |
| | ) **3730(b)(2) and (3)** |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA and the STATE OF TEXAS, *ex rel.* JOHN DOE,<br><br>Plaintiffs,<br><br>vs.<br><br>DALLAS COUNTY, TEXAS, THE DALLAS COUNTY HOSPITAL DISTRICT DBA PARKLAND HEALTH AND HOSPITAL SYSTEMS, KAREN KOWALSKE, M.D., SAMUEL BIERNER, M.D., VINCENT GABRIEL, M.D. ANNE HUDAK, M.D., and SUSAN KNAPTON, M.D.,<br><br>Defendants. | Case No.:  3-10 CV 0487 D<br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACTS 31 U.S.C. §§ 3729, *et seq.* AND Tex. Hum. Res. Code § 36.001 *et seq*<br><br>JURY TRIAL DEMANDED<br><br>**LODGED UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b)(2) and (3)** |

Respectfully submitted,

Donald R. Warren  (Lead Counsel - *pro hac vice*)
Warren ▪ Benson Law Group
7825 Fay Ave., Suite 200
La Jolla, CA 92037
Telephone: (858) 456-1900
Facsimile: (858) 454-5878
donwarren@warrenbensonlaw.com

and local counsel

Gregory P. Gorman (Bar. 00787569) (Local Counsel)
Law Offices of Gregory P. Gorman
1349 Empire Central Dr., Ste. 600
Dallas, Tx 75247-4042
Telephone: (214) 905-3739
Facsimile: (214) 905-3799
greg@gormanlaw.com

Attorneys for *Qui Tam* Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA *ex rel.* JOHN DOE, | ) Case No.: |
| | ) |
| Plaintiffs, | ) FIRST AMENDED COMPLAINT FOR |
| | ) VIOLATIONS OF FALSE CLAIMS |
| | ) ACTS 31 U.S.C. §§ 3729, *et seq.* AND |
| vs. | ) Tex. Hum. Res. Code § 36.001 *et* |
| | ) *seq* |
| DALLAS COUNTY, TEXAS, THE | ) |
| DALLAS COUNTY HOSPITAL DISTRICT | ) |
| DBA PARKLAND HEALTH AND HOSPITAL | ) JURY TRIAL DEMANDED |
| SYSTEMS, KAREN KOWALSKE, M.D., | ) |
| SAMUEL BIERNER, M.D., VINCENT GABRIEL, | ) |
| M.D. ANNE HUDAK, M.D., and SUSAN | ) **LODGED UNDER SEAL** |
| KNAPTON, M.D., | ) **PURSUANT TO 31 U.S.C. §§** |
| | ) **3730(b)(2) and (3)** |
| Defendants. | ) |

COMES NOW *QUI TAM* RELATOR-PLAINTIFF Lien Kyri, suing for himself (as John

Doe) and for the United States of America, pursuant to 31 U.S.C. § 3730 *et seq*, and the State of

Texas pursuant to Tex. Hum. Res. Code § 36.001 *et seq*, and alleges as follows:

1.      This action is based upon the defendants' submitting and causing the submission of

false claims to Medicare, Medicaid and other federally funded healthcare programs by 1) causing

the submission of thousands of claims for false "consultations" that were not reimbursable

because they were never requested by the patients' primary care physician; 2) causing the

submission of thousands of claims under the name of teaching physicians at a teaching hospital

when, in reality, only residents were involved without the necessary teaching physician presence,

and the claims were therefore unreimbursable as physician services; 3) causing the submission of

thousands of false claims with upcoded and inflated levels of evaluation and management

---

("E&M") billing codes; 4) submitting, and causing the submission of, false claims for improper

Inpatient Rehabilitation Facility ("IRF") stays for patients that did not meet Medicare and

Medicaid coverage requirements; and 5) submitting, and causing the submission of, false Cost

Reports that included the above false claims.

## I.  JURISDICTION

2.      Jurisdiction over the federal claims asserted herein is based upon federal subject

matter pursuant to 31 U.S.C. § 3729 *et seq.*

3.      Jurisdiction over the state claims asserted herein is based upon 31 U.S.C.

§ 3732(b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4.      The Court may exercise personal jurisdiction over the defendants pursuant to 31

U.S.C. § 3732(a).

## II.  VENUE

5.      Venue is proper in the Northern District of Texas, under 31 U.S.C. § 3732 and 28

U.S.C. §§ 1391(b) and (c) because the defendants transact business in this District and because the

defendants committed acts within this district that violated 31 U.S.C. § 3729.

## III.  PARTIES

6.      *Qui tam* plaintiff Dr. Lien Kyri (suing as "John Doe") is a physician who

performed a three year medical residency in the Physical Medicine and Rehabilitation residency

program at Parkland Memorial Hospital from 2005 through 2008, following his graduation from

the University of California at Irvine School of Medicine and completion of a medical internship

from the University of California San Francisco, Fresno.  As such, Dr. Kyri was involved with

Parkland's patients through the following Physical Medicine and Rehabilitation Department

resident consultation rotations: Trauma, Neurosurgery, Medicine/Geriatrics, Surgery/Neurology,

Spinal Cord Injury, Burns and Gym Doctor rotations. Gym Doctor is a coverage rotation (with other responsibilities in the Physical Medicine and Rehabilitation gym) that cross covers consultations for residents who are on vacation. While in the residency program, Dr. Kyri began immediately to verbally question some of the Defendants' improper billing practices as alleged herein, only to suffer swift retaliation at the hands of Parkland's management. Despite this, Dr. Kyri successfully graduated from the Parkland Hospital residency program on June 30, 2008. Dr. Kyri is a United States citizen and a resident of the State of California, and is in the process of seeking his medical license in California.

7. The United States of America, through its agencies, including, Centers for Medicare and Medicaid Services, and its Veterans Administration, among others, has provided funds for the false claims at issue herein.

8. The State Texas, through its participation in the Medicaid program, has provided funds for the false claims at issue herein.

9. Dallas County is a county within the Northern District of Texas, and operates a teaching hospital through its component, Dallas County Hospital District.

10. Dallas County Hospital District dba Parkland Health and Hospital Systems operates Parkland Memorial Hospital, which is a teaching hospital engaged in an approved Graduate Medical Education ("GME") residency program in medicine. As such, Parkland Health and Hospital Systems receives direct GME payments by Medicare for the services performed by medical residents. As a result, the services performed by those residents cannot be separately billed under the Medicare Physician Fee Schedule unless a teaching physician is physically present during the critical or key portions of the service. 42 C.F.R. 415.170, 172; Medicare Claims Processing Manual, Chapter 12, Section 100 - Teaching Physician Services. In that event,

then the services of the teaching physician physically present during the critical or key portions of the service can be billed.

11.     Dr. Karen Kowalske is the Chair of Dallas County Hospital District's (dba Parkland's) Physical Medicine and Rehabilitation Department and Medical Director of Dallas County Hospital District's Inpatient Rehabilitation Units at the facility known as Parkland Health and Hospitals Systems 8E (PHHS 8E).  In past years Dr. Kowalske has also been Parkland's Lead Physician in its outpatient Burn Clinic Consult Service ("Burn Clinic").  In her capacity as Dallas County Hospital District's PM&R Department Chair, Lead Physician of its Burn Clinic, and Medical Director of its Inpatient Rehabilitation Units at its 8E facility, Dr. Kowalske directed Dallas County Hospital District employees, including its resident physicians and fellows and clerical staff, to create false supporting documentation on Dallas County Hospital District medical forms, so that the false supporting documentation would be used to cause the submission of the false claims discussed herein.  Dr. Kowalske resides in the Northern District of Texas.

12.     Dr. Samuel Bierner was the Lead Physician, Medical Director and Chief of Service for Dallas County Hospital District's (dba Parkland's) Physical Medicine and Rehabilitation Department and Multispine Clinic in at least 2006 through 2010.  In his capacity as Dallas County Hospital District's Lead Physician, Medical Director and Chief of Service for its PM&R Department and Multispine Clinic, Dr. Bierner directed Dallas County Hospital District employees, including its resident physicians and fellows and clerical staff, to create false supporting documentation on Dallas County Hospital District medical forms, so that the false supporting documentation would be used to cause the submission of the false claims discussed herein.  Dr. Bierner resides in the Northern District of Texas.

13.     Dr. Vincent Gabriel is the Lead Physician and Supervisor for Dallas County Hospital District's (dba Parkland's) inpatient Burn Unit and outpatient Burn Clinic.  In his capacity as Dallas County Hospital District's Lead Physician and Supervisor of its inpatient Burn Unit Consult Service and outpatient Burn Clinic, Dr. Gabriel directed Dallas County Hospital District employees, including its resident physicians and fellows and clerical staff, to create false supporting documentation on Dallas County Hospital District medical forms, so that the false supporting documentation would be used to cause the submission of the false claims discussed herein.  Dr. Gabriel resides in the Northern District of Texas.

14.     Dr. Anne Hudak was the Medical Director and Chief of Service of Dallas County Hospital District's (dba Parkland's) Physical Medicine and Rehabilitation Department from 2005 through 2008, and has been Medical Director of its Consult Services and its Traumatic Brain Injury Clinic.  In her capacity as Dallas County Hospital District's Medical Director of its Consult Services and its Traumatic Brain Injury Clinic, Dr. Hudak directed Dallas County Hospital District employees, including its resident physicians and fellows and clerical staff, to create false supporting documentation on Dallas County Hospital District medical forms, so that the false supporting documentation would be used to cause the submission of the false claims discussed herein.  Dr. Hudak resides in the Northern District of Texas.

15.     Dr. Susan Knapton was the Medical Director and Chief of Service for Dallas County Hospital District's Physical Medicine and Rehabilitation Department and was Medical Director of Parkland's Inpatient Rehabilitation Facility (from 2008 to April 2010).  In her capacity as Dallas County Hospital District's Medical Director and Chief of Service for its PM&R Department, Dr. Knapton directed Dallas County Hospital District employees, including its resident physicians and fellows and clerical staff, to create false supporting documentation on

Dallas County Hospital District medical forms, so that the false supporting documentation would be used to cause the submission of the false claims discussed herein. Dr. Knapton resides in the Northern District of Texas.

### IV. The Medicare and Medicaid Programs

16.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain health care services. The Medicare Program is a federally funded program designed to primarily provide health care benefits to the aged. Part A of the Medicare Program authorizes payment for institutional care, including inpatient hospital care and related services. *See* 42 U.S.C. §§ 1395c-1395i-5. Part B of the Medicare Program authorizes payment for physician services and other non-institutional medical services. *See* 42 U.S.C. §§ 1395j–1395w-20. A substantial portion of Parkland Health and Hospital Systems' revenues are derived from payments received under the Medicare and Medicaid Programs and other federally funded programs.

17.     HHS is generally responsible for the administration and supervision of the Medicare Program. CMS, a component of HHS, is directly responsible for the administration of the Medicare Program. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries," typically insurance companies, who are responsible for processing and paying claims and auditing cost reports. 42 U.S.C. § 1395h. Similarly, CMS contracts with "carriers" to assist in the administration of Medicare Part B. 42 U.S.C. § 1395u.

18.     Not surprisingly, in order to prevent waste, fraud and abuse, the Social Security Act, 42 U.S.C. § 1395y(a)(1) states the Medicare Program is only authorized to pay for items and services that are medically "reasonable and necessary." The Secretary of HHS is authorized to define what services meet that criteria. 42 U.S.C. § 1395ff(a). Medicaid and other federally

funded programs also only pay for items and services that are medically "reasonable and necessary."

19.     Medicare providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those stated in the Medicare Manuals. *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 64-65 (1984). A provider's failure to inform itself of the legal requirements for participation in the program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it with knowledge of the falsity of the claims or certifications in question, under the False Claims Act. *United States v. Mackby,* 261 F.3d 821, 828 (9th Cir. 2001). These requirements also apply to Medicaid providers.

20.     42 CFR 411.406, was promulgated in February 1986, and directed that providers look to CMS manual to know what services are excluded from coverage:

> §411.406. Criteria for determining that a provider, practitioner, or supplier knew that services were excluded from coverage... as not reasonable and necessary.
>
> (a) Basic rule. A provider, practitioner, or supplier that furnished services... that are not reasonable and necessary... is considered to have known that the services were not covered if any one of the conditions specified in paragraphs (b) through (e) of this section is met.
>
>                                           * * *
>
> (e) Knowledge based on experience, actual notice, or constructive notice. It is clear that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage on the basis of --
> (1) *Its receipt of HCFA notices, including Manual issuances*, bulletins or other written guides or directives.... (*emphasis added*).

21.     Since March 2, 1988, Medicare regulations have expressly stated that one of the "basic conditions" for a provider to receive payment from Medicare is that the provider "must furnish to the intermediary or carrier sufficient information to determine whether payment is due

---

and the amount of payment." 42 C.F.R. § 424.5(a)(6). Prior to that time, Medicare regulations included the requirement: "The provider shall furnish such information to the intermediary as may be necessary to assure proper payment by the program." 42 C.F.R. § 405.406(d).

22.     Under the Medicare Program, CMS enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare Program. Upon discharge of a Medicare beneficiary from a participating hospital, the hospital submits claims for interim reimbursement for items and services provided to the beneficiary. Hospitals submit patient-specific claims for interim payments on a standard form. Before 1994, this was called a HCFA Form UB-82. After 1994, a modified version called a HCFA Form UB-92 was used.

23.     In addition to claims for services to individual patients, Medicare providers are required to submit annually a Form HCFA-2552, more commonly known as the Hospital Cost Report, stating the amount of interim payments they have received and the amounts they believe they were entitled to receive from Medicare during the year. Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. If the Hospital Cost Report shows that the interim payments that Medicare made to a provider exceed the amount the provider was entitled to receive, the provider must reimburse Medicare for the difference.

24.     At all times relevant to this Complaint, every Hospital Cost Report contained a "Certification" that had to be signed by the chief administrator of the provider or a responsible designee of the administrator. That Certification stated in part:

> to the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and

---

records of the provider in accordance with applicable instructions,
except as noted.

25.     Thus, defendants were required to have Parkland Hospital certify that each filed

Hospital Cost Report was (1) truthful, i.e., that the cost information contained in the report was

true and accurate, (2) correct, i.e., that the provider was entitled to reimbursement for the reported

costs in accordance with applicable instructions, and (3) complete, i.e., that the Hospital Cost

Report was based upon all information known to the provider.

26.     The Hospital Cost Report form (Form HCFA-2552-81) reminded providers that

"intentional misrepresentation or falsification of any information contained in this cost report may

be punishable by fine and/or imprisonment under federal law."

27.     Medicare providers are required to disclose all known errors and omissions in their

claims for Medicare reimbursement (including their cost reports) to their fiscal intermediaries.  42

U.S.C. § 1320a-7b(a) states in part:

>   Whoever . . . having knowledge of the occurrence of any event affecting (A)
>   his initial or continued right to any such benefit or payment . . . conceals or
>   fails to disclose such event with an intent fraudulently to secure such benefit
>   or payment either in a greater amount or quantity than is due or when no such
>   benefit or payment is authorized . . . shall . . . be guilty of a felony. . . .

28.     The Medicaid program is a joint federal-state program that provides health care

benefits for certain groups, primarily the poor and disabled.  Under the Medicaid program, the

Federal government provides matching funds and ensures that the states comply with minimum

standards in the administration of the program.  The federal Medicaid statute sets forth the

minimum requirements for state Medicaid programs to qualify for federal funding (which is called

federal financial participation or "FFP").  42 U.S.C. § 1396, et seq.  Each state's Medicaid

program must provide hospital services.  42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

---

29.     Provider hospitals participating in the Medicaid program file annual cost reports

with the state agency administering the particular state's Medicaid program, or its intermediary, in

a protocol similar to the one governing the submission of Medicare cost reports. Likewise,

hospitals submit claim forms for individual patient claims in a manner similar to Medicare claims.

Like Medicare, the Medicaid Program used the UB-82 and 92 form for reimbursement. These

forms contain the following certification on the back of the billing form:

> This is to certify that the foregoing information is true, accurate, and complete.
>
> I understand that payment and satisfaction of this claim will be from Federal and
> State funds, and that any false claims, statements, or documents, or concealment of
> a material fact, may be prosecuted under applicable Federal or State laws.

30.     Where a provider submits a Medicaid cost report that contains the same false or

incorrect information contained in the provider's Medicare cost report, false statements and false

claims have been made for reimbursement from Medicaid.

## V.   Defendants' Misconduct

31.     Defendants Dallas County and the Dallas County Hospital District

dba Parkland Health and Hospital Systems own and operate Parkland Hospital, which is a

teaching hospital engaged in an approved Graduate Medical Education ("GME") residency

program in medicine. Teaching hospitals, including Parkland, are compensated by direct GME

payments from Medicare for the costs of medical residents and the services performed by those

residents and fellow cannot separately be billed for additional reimbursement under the Medicare

Physician Fee Schedule unless a teaching physician is physically present during the critical or key

portions of the service. 42 C.F.R. 415.170, 172 (*"If a resident participates in a service furnished*

*in a teaching setting, physician fee schedule payment is made only if a teaching physician is*

---

*present during the key portion of any service or procedure for which payment is sought.*);
Medicare Claims Processing Manual, Chapter 12, Section 100 - Teaching Physician Services.

     32.    However, rather than merely having federal and state healthcare programs pay only the federal GME revenues for each medical resident in their three year medical residency program at Parkland (as is required), Defendants engaged in a scheme to fraudulently maximize Medicare and Medicaid payments by using the residents as unwitting pawns to cause false billings under the Physician Fee Schedule for teaching physician services that were never requested and never performed.  The Defendants carried out this scheme by directing Dallas County Hospital District employees, including its resident physicians and fellows and clerical staff, to create false supporting documentation on Dallas County Hospital District medical forms, so that the false supporting documentation would cause the submission of the false claims discussed herein.

     33.    The Defendants caused the submission of these false claims in five ways:  **1)** by causing the submission of thousands of claims for false "consultations" that, in fact,  were never requested by the patients' physicians;  **2)** by causing the submission of thousands of false claims under the name of teaching physicians when, in reality, only residents were involved without the necessary teaching physician presence, and the claims were therefore unreimbursable as physician services in the teaching setting;  **3)** by causing the submission of thousands of false claims with upcoded and inflated levels of evaluation and management ("E&M") billing codes;  **4)** by submitting, and causing the submission of, false claims for improper Inpatient Rehabilitation Facility ("IRF") stays for patients that did not meet Medicare and Medicaid coverage requirements; and  **5)** by submitting, and causing the causing the submission of, false Cost Reports that included the above false claims.

34.     The core Dallas County Hospital District (Parkland) medical Chiefs of Service, Medical Directors, Medical Supervisors and Lead Physicians directly involved in and responsible for requiring these false supporting documents for the creation of false claims include: Dr. Karen Kowalske (Chair of Parkland's Physical Medicine and Rehabilitation Department and Medical Director of Parkland's Inpatient Rehabilitation Units and previously Lead Physician in Parkland's Burn Clinic), Dr. Samuel Bierner (Parkland's Lead Physician of the Multi-spine and PM&R Clinics Medical Director and Chief of Service for its PM&R Department), Dr. Vincent Gabriel (Parkland's Lead Physician and Supervisor its inpatient Burn Unit Consult Service and outpatient Burn Clinic), Dr. Anne Hudak (Parkland's PM&R Department Medical Director and Chief of Service from 2005 through 2008, and previously Medical Director of its Consult Services and its Traumatic Brain Injury Clinic), and . Dr. Susan Knapton (Parkland's Medical Director and Chief of Service for its PM&R Department from 2008 through April 2010).

35.     Dr. Karen Kowalski, Dr. Samuel Bierner, Dr. Vincent Gabriel, Dr. Anne Hudak and Dr. Susan Knapton function in dual capacities: 1) in medical management positions for Dallas County Hospital District ("Parkland") and 2) as teaching physicians for the University of Texas. Southwestern Medical School ("UTSW").  Although these physicians receive compensation from UTSW, their conduct in committing the Medicare and Medicaid fraud discussed in this Amended Complaint was not done in their capacities as UTSW employees or UTSW contract physicians.  In fact, their contracts with UTSW confirm that compliance with all federal and state laws and regulations for documentation for billing third party payers is the individual responsibility of each physician.

36.     Although each of the individual physician defendants specifically acknowledged it was his or her own responsibility to adhere to federal and state regulations for documentation for billing third party payers, each also had a financial incentive to commit the Medicare and Medicaid fraud alleged herein.  Their UTSW compensation contracts state their base compensation rate may rise and fall from year to year in recognition of their "productivity", and also that a portion of their compensation above their bases salary is at risk if their productivity decreases.

37.     The Defendants, including the individual physician defendants, accomplished their schemes to cause the false submission of claims by using their authority over Dallas County Hospital District employees, including its resident physicians and fellows and clerical staff, to direct that resident physician and fellows and clerical staff create false supporting documentation on Dallas County Hospital District medical forms for each of the schemes discussed herein. These false medical forms were then used by the Defendants as supporting documentation to cause the submission false claims to Medicare and Medicaid.  These schemes each are addressed hereunder.

38.     **1) False "Consultations" Billing Scheme.**     *"Consultation* means a professional service furnished to a patient by a physician if the following conditions are satisfied:

(1) The physician's opinion or advice regarding evaluation and/or management of a specific medical problem is requested by another physician.

(2) The request and need for the consultation are documented in the patient's medical record.

(3) After the consultation is provided, the physician prepares a written report of his or her findings, which is provided to the physician who requested the consultation."

---

42 C.F.R. § 411.351

39.     A consultation is distinguished from other evaluation and management services because the intent of a consultation is that a treating physician has explicitly asked another physician for advice, opinion, a recommendation, or counsel in evaluating or treating a patient because that individual has expertise in a specific medical area beyond the requesting professional's knowledge. (*See, Medicare Claims Processing Manual*, Chapter 12, §30.6.10 - Consultation Services.)  In these situations, a written request for a consultation from an appropriate source and the need for a consultation must be documented by the consultant in the patient's medical record and included in the requesting physician's plan of care in the patient's medical record. *Id.* This satisfies the "medical necessity" requirement for reimbursability.

40.     However, at Parkland Hospital, the Defendants directed that this medical necessity requirement for consultations be circumvented via two methods.

41.     First: Misuse of non-physician level therapy orders.  Parkland's Physical Medicine and Rehabilitation department ("PM&R") uses non-physician level therapy orders intended only for physical, occupational or speech therapists as a basis for falsely pretending that a physician "consultation" was requested.  Until about in or about February to April 2009 when Parkland's computerized patient management and ordering system went live, all therapy orders from attending physicians were faxed to the office secretary for Parkland's Gymnasium and PM&R Clinic so that an appropriate therapist could be routed to the patient.  However, the PM&R secretary has a standing direction from the department's directors and management to photocopy the therapy order and not only send one copy to the appropriate therapist, but also place the extra copy in one of the PM&R physician consult service bins (Surgery/Neurology, Trauma, Neurosurgery, Medicine/Geriatrics), according to which primary service issued the therapy

request.  PM&R uses this photocopied therapy order as a basis to then send a PM&R resident to the patient and pretend that a physician "consultation" has been requested **in addition to** the non-physician therapy request.

42.      The Defendants use these "blind consultations" to not only cause the submission of claims for false consultations, but also to find patients and generate business for the PM&R department and create self-referrals for PM&R physicians working in Parkland's adjacent outpatient PM&R clinics, Parkland's Inpatient Rehabilitation Facility, known as PHHS 8 East and also the UT Southwestern's Zale-Lipshy Hospital based PM&R operations.  This scheme typically targets new patients who generally have no prior relationship with PM&R from Parkland's general inpatient population.  The key American Medical Association Current Procedural Terminology ("AMA CPT")  billing codes violated are  99251 - 99255 for Initial Inpatient Consultations, 99231 - 99233 for additional follow-up consultation visits (prior to January 1, 2006), and 99261 - 99263 for additional follow-up consultation visits (effective January 1, 2006).  In 1983, CMS adopted AMA CPT as part of the Healthcare Common Procedure Coding System ("HCPCS") and mandated that providers use HCPCS to report consultations and other services to Medicare.

43.      <u>Second: Shadowing Patients with certain profiled acute disabilities</u>.  The Physical Medicine and Rehabilitation department at Parkland also "shadows" patients under the care of other medical services that have certain distinct diagnoses [e.g. Burn, Spinal Cord Injury (SCI), Trauma especially for Traumatic Brain Injury (TBI) patients].  By way of example, the PM&R department's Burn and Trauma Consult services automatically "consults" all burn patients arriving at the Burn ICU (BICU) and Burn Acute Care Center (BACC) and all trauma patients

---

arriving at the ICU, regardless of whether the primary care teams, Burn Surgery and other ICU medical services, are aware of PM&R's presence or not.

44. Similarly, PM&R's Spinal Cord Injury Consult service also automatically "consults" all acute SCI injuries that arrive at Parkland. This practice occurs even though consultation requests from the primary care team were neither made nor documented in the medical records.

45. Additionally, through this scheme, the Defendants not only cause the submission of bills for false "consultations" that were never requested in the first place, but also for often duplicative false "consults" because there are multiple Physical Medicine and Rehabilitation resident and fellow consult rotations occurring at the same time by separate Physical Medicine and Rehabilitation residents and fellows, which are each following this directive simultaneously. For instance, the Traumatic Brain Injury Fellow, Trauma consult services, and Neurosurgery consult services often simultaneously see acute Traumatic Brain Injury, Trauma, and Neurosurgery patients arriving into the Trauma and Surgery ICU, even though no consultation was ever requested for any of them, let alone all of them. The Defendants know that more than one resident or fellow is following the same patient, and encourage certain PM&R consult residents or fellows to separately follow the same patient.

46. Consequently, the AMA CPT Initial Inpatient Consultations codes (99251 -99255) and additional follow-up consultation visits are reported more than once (i.e. they are redundantly coded), per facility stay, by multiple resident or fellow consultants representing a single PM&R consult (i.e. billed to Medicare under the name of a single licensed teaching faculty preceptor). This is a Medicare violation as Initial Inpatient Consultations codes 99251 - 99255 may only be

reported once, per consultant, per facility stay. (American Medical Association Current Procedural Terminology, Instructions for Use of Inpatient Consultation Codes).

47.     This practice of billing for false "consultations" that were never requested encompasses false "consultation" billings in each of the following areas:

- Trauma Consultations  -  (residency)

- Neurosurgery Consultations  -  (residency)

- Medicine/Geriatrics Consultations  -  (residency)

- Surgery/Neurology Consultations  -  (residency)

- Spinal Cord Injury ("SCI") Consultations  -  (residency and fellowship)

- Burns Consultations  -  (residency)

- Traumatic Brain Injury ("TBI") Consultations  -  (fellowship)

- Gym Doctor rotation, which cross covers for consult residents on vacation

48.     This blanket policy results in many "consults" being performed on patients who are in their acute phase of injury/illness, when they are not medically stable, versus the traditional recuperative or recovery phase of injury/illness for rehabilitation when the patients are medically stable and more appropriately candidates for rehab treatment.  As a result, this policy unfortunately has put patients' well being and health at risk, especially when they are forced to undergo Physical Medicine and Rehabilitation 'consults" on the day, or within days, of their admission into the ICU (Intensive Care Unit).

49.     Parkland PM&R Chair, Dr. Karen Kowalske, issued an executive directive for residents and fellows to see all potential patients as early as possible during their Parkland inpatient stay, including while in the ICU.  In the ICU, that meant even seeing patients within days (or on the day) of their admission to PHHS for serious injuries and illness.  This constitutes the

patients' acute period of injury/illness when any rehabilitation efforts are largely contraindicated or without any foreseeable purpose. During this time, the patients or their injuries may not have been definitively treated or stabilized [e.g. unfixed fractures, internal organ damage, patients in serious, critical, or grave (dying) condition, preop patients for serious injuries needing imminent surgeries, etc.] and patients who are otherwise unable to participate in any therapy to be appropriate for rehab. Such patients are in the hyperacute phase of injury when crucial medical interventions are still actively being undertaken to treat unstable medical conditions, and rehab evaluations, manipulations, and other efforts should not be undertaken. In other ICU cases, the patients are otherwise not capable of participating in any therapy to be appropriate for rehab.

50.    The above stated directive from the Chair also placed many medically unstable patients in jeopardy for further injury and serious harm because the nature of their untreated or unstabilized medical conditions contraindicated any unnecessary and invasive rehab physical examinations, testing, or interventions, and who were contraindicated for any activity due to strict activity restrictions (e.g. bed rest, vasospasm watch, grave condition, etc.). For example, it is dangerous to startle someone on vasospasm watch for a subarchnoid hemorrhage (e.g. reflex testing using a reflex hammer, joint manipulations, etc.) because that may increase their blood pressure or pain-level, and may precipitate dangerous cerebral vasospasms leading to an ischemic stroke. Yet, this was directed to be done solely for the purpose of having residents and fellows systematically be able to record on Parkland medical forms that a rehab consult was performed with these newly admitted patients, and so that the false Parkland medical forms would be used as support to cause false billings.

51.    Further, placing unstable, acutely injured Traumatic Brain Injury patients on neuro-stimulants, who are not participating in therapy or are medically contraindicated for neuro-

stimulants in the ICU, so that a resident or fellow can record having done a rehab consult, is dangerous. Neuro-stimulants (methylphenidate, dextro-methamphetamine, amantidine, bromocriptine, etc.) are usually employed in rehab wards to only increase attention, alertness, and participation in therapy; however, they have not been proven to increase or speed recovery, decrease length of stay, improve cognitive recovery, or improve patient outcomes. However, these drugs were routinely ordered for patients with unstable, acute Traumatic Brain Injury or otherwise in comatose or otherwise unconscious states in the ICU, even when therapies were not ordered, contradicted, or the patients were not consciously participating in therapy. In many severe cases, acute Traumatic Brain Injury (TBI) patients are actually treated with Phenobarbital (a potent barbiturate) to induce a coma in these patients by ICU or Trauma doctors as a means to reduce the metabolic demands of the brain to prevent further ischemic injuries from oxygen debt. Acute TBI patients have injured and disrupted blood vessels to the brain that compromise oxygen delivery. By placing these unstable, acutely injured TBI patients on neuro-stimulants for the purpose of being able to record a rehab "consult", PM&R is increasing the metabolic demand of the brain for oxygen and increasing the likelihood for ischemic injuries to the brain from oxygen debt. In addition, if a TBI patient also has a traumatic liver injury, many of the neuro-stimulants will tax the function of the injured liver. It is best in these situations to not disrupt the diligent efforts of ICU and Trauma doctors and allow the patients time to quietly recuperate from their injuries during the acute phase of injury without aggressively pursuing rehabilitation before the patients are medically stable.

52. In addition, for patients on the verge of dying, there is no known benefit to pursue a course of rehab to improve their likely outcomes. Yet, PM&R has directed that consults be done automatically on even these patients.

53. Finally, ICU teams are well versed in medical and nursing issues related to prolonged immobility and disabilities brought about by prolonged bed rest. All long-term issues for prolonged immobility (e.g. frequent turning to prevent bed sores, early mobility by therapists to prevent muscle wasting and joint contractures, out-of-bed orders to facilitate mobilization, foley catheter insertion, bowel programs, splinting, deep venous thrombosis prophylaxis, etc.) were often well addressed by the ICU team of doctors, nurses, therapists, and other supporting services before PM&R ever saw these patients for a rehab consult. In essence, in addition to the above reasons for lack of medical necessity for a rehab consult, the fact of the comprehensive care in the ICU also precluded the medical necessity for a full medical rehab evaluation.

54. <u>Following potential rehab patients via additional "consults".</u> For those patients deemed likely to be potential inpatient rehab candidates later in their hospital course, residents are instructed to continuously follow-up and keep track of these patients (throughout their ICU stays and after they are transferred to the medical floors for observation) until the first opportunity arises to recommend them to transfer to PM&R's physicians for inpatient rehab at PHHS 8 East or UTSW Zale-Lipshy Hospital. As a result, consult billings are generated for these patients for follow-up visits when PM&R is essentially only tracking and not treating these patients for the intent of self-referral into the rehab wards.

55. There often is very little for PM&R to do and no medical necessity for a PM&R consultation (especially while patients are being treated in the ICU) until the time the patients are ready for inpatient rehab. Nonetheless, many follow up consults and visits are billed through the PM&R department through residents' notes and encounter (billing) forms. This is reflected in residents' notes recommending doing little else in terms of treatment other than simply continuing the ICU teams' treatment plan and adding the post-script *"will continue to follow"*. Patients are

continually followed via false "consultations" for the sole purpose of carefully keeping track of these patients and recommending transfers for PM&R's doctors into PHHS 8 East or Zale-Lipshy Hosptal inpatient rehab at the first opportunity. This is done to avoid losing these potential candidates to other established and intended patient dispositions (e.g. transfer to nursing homes, long-term acute care facilities, discharge to home or family, etc.).

    56.    The Defendants' conduct has resulted in hundreds of thousands of false consult billings to Medicare and Medicaid. Parkland has a policy for residents to fill out Parkland encounter (billing) forms for all consults that the residents see on the Trauma, Neurosurgery, Medicine/Geriatrics, Surgery/Neurology, Burn and Gym Doctor resident rotations. This policy was directed by Dr. Anne Hudak (and to a lesser extent, Dr. Vincent Gabriel). As a result, in 2006, Dr. Hudak reintroduced this policy to ensure that the consult billings were maximized for PM&R physicians, usually at the highest and maximum Evaluation and Management (E&M) levels. These encounter forms are collected in a wooden tray in the residents' room and picked up once a week by a representative from the Billing Department.

    57.    Parkland's PM&R department sees approximately 70,000 patients per year. A PM&R resident typically sees from 10 to 30 new "consults" (not including follow-up consult visits) per day. There are six dedicated consult services provided by PM&R residents (in addition to Traumatic Brain Injury and Spinal Cord Injury fellows): Trauma Consultations, Neurosurgery Consultations, Medicine/Geriatrics Consultations, Surgery/Neurology Consultations, Burns Consultations, Spinal Cord Injury Consultations (resident level), and an additional Gymnasium (Gym Doctor) rotation (which cross-covers the other six consultation rotations). On information and belief, it is estimated there are between 20,800 and 62,400 new consults done by PM&R

residents per year, and that at least 80% of these billed "consults" were never requested by a treating physician.

58.  **2) Causing false billings for residents under the Physician Fee Schedule.**  As stated earlier, Parkland, as a teaching hospital, is compensated by direct Graduate Medical Education (GME) payments from Medicare for the costs of medical residents.  The services performed by those residents cannot separately be billed for additional reimbursement under the Medicare Physician Fee Schedule unless a teaching physician is physically present during the critical or key portions of the service.  42 C.F.R. 415.170, 172 (*"If a resident participates in a service furnished in a teaching setting, physician fee schedule payment is made only if a teaching physician is present during the key portion of any service or procedure for which payment is sought.*);  Medicare Claims Processing Manual, Chapter 12, Section 100 - Teaching Physician Services.

59.  However, Parkland has an ingrained practice of creating false documentation to cause false billings for residents' "consultations" and Evaluation and Management visits through the false representation that they were performed with a teaching physician being present during the critical or key portions of the service.

60.  Medicare defines these requirements at 42 C.F.R. 415.152, the Medicare Claims Processing Manual, Chapter 12, §100, and the Medicare Benefit Policy Manual, Chapter 1, §110, as follows:

- <u>Resident</u> - An individual who participates in an approved graduate medical education (GMR) program or a physician who is not in an approved GME program, but who is authorized to practice only in a hospital setting.  The term includes interns and fellows in GME programs recognized as approved for

---

purposes of direct GME payments made by the F[iscal] I[ntermediary].  Receiving

a staff or faculty appointment or participating in a fellowship does not by itself

alter the status of "resident".  Additionally, this status remains unaffected

regardless of whether a hospital includes the physician in its full time equivalency

count of residents.

- Teaching Physician - A physician (other than another resident) who involves

  residents in the care of his or her patients.

- Rehabilitation Physician - A licensed physician with specialized training and

  experience in rehabilitation.

- Physically Present - The teaching physician is located in the same room (or

  partitioned or curtained area, if the room is subdivided to accommodate multiple

  patients) as the patient and/or performs a face-to-face service.

- Critical or Key Portion - That part (or parts) of a service that the teaching physician

  determines is (are) a critical or key portion(s).  For purposes of this section, these

  terms are interchangeable.

- Documentation - Pursuant to 42 C.F.R 172(b), documentation must identify, at a

  minimum, the service furnished, the participation of the teaching physician in

  providing the service, and whether the teaching physician was physically present.

  Documentation by the resident of the presence and participation of the teaching

  physician is not sufficient to establish the presence and participation of the teaching

  physician.  (Medicare Claims Processing Manual, Chapter 12, §100.1-1.)  Rather,

  the teaching physician must document that he/she either performed, or was present

during the performance of, the critical or key portion(s) of the service.  )Medicare

Claims Processing Manual, Chapter 12, §100.1-1.)

61.     Parkland's policy that residents should perform "consults" and E&M evaluations

without teaching physicians is documented in its "Guidelines for the Supervision of Junior

Residents by Senior Residents" (written by Dr. Samuel Bierner - Lead Physician, Medical Director

and Chief of Service for Parkland's PM&R Department and Multispine Clinic, and Parkland

Residency Program Director):

Specific guidelines:

For the purposes of this policy, a senior resident is one who is at least one year in training
ahead of the resident that is being supervised.

Supervision of junior residents and medical students by senior residents is an integral part
of the residency program, and thus helps junior residents and students to learn and to
improve the teaching skills of senior residents.

Consults: Seniors are asked to help junior residents the first few weeks of medicine,
surgery, geriatric, and neurology consult services.  This includes reviewing the initial
consult history and physical, writing therapy orders, deciding level of care and
appropriateness of inpatient rehabilitation.  Trauma and Neurosurgery are senior
rotations only; therefore, junior resident supervision is not typically involved although
the PGY-4 may supervise the PGY-3.

Wards: Seniors are responsible for helping to review admission H&Ps, reviewing admission
orders and therapy orders, and daily supervision of clinical issues, as needed.

62.     Residents are instructed to fill in the supervising faculty physician's  name on

Parkland Hospital encounter (billing) forms in order to credit the preceptors for billing under the

Medicare Physician Fee Schedule when, in reality, residents perform these "consults" and E&M

evaluations on their own more than 99% of the time, without a teaching physician being present at

all, much less being present for the critical or key portions of the service.

63.     **3) Causing false billings at upcoded and inflated levels of evaluation and**

**management ("E&M") billing codes.** In addition to the above violations, Parkland's Physical Medicine and Rehabilitation department has a practice of requiring that residents and fellows record inflated levels E&M codes in hospital consultation encounters.

64.     Medicare has specific billable codes to be used by physicians seeing a patient in an initial consultation setting.  These codes and their criteria are set forth in the Current Procedural Technology ("CPT") codebook issued by the American Medical Association as 99241 - 99245 (for outpatient settings) and 99251 - 99255 (for inpatient settings).  These CPT codes result in five different levels of reimbursement, depending on the extent and complexity of the examination, the complexity of the necessary medical decision making involved and the duration of the physician's face-to-face meeting with the patient and/or family.  The patient examinations for these codes are often referred to as a "*Level 1 exam*" (lowest) through a "*Level 5 exam*" (highest).  For follow up inpatient consultations, the billing codes misused were 99261 - 99263 (through 2005), and 99231 - 99233 (beginning 2006), with three levels of exams. For initial outpatient consultations, the billing codes misused were 99241 - 99245 with four levels of exams.  For follow up outpatient consultations, the billing codes misused were 99212 - 99215 with four levels of exams.  Centers for Medicare and Medicaid Services (CMS) "Evaluation & Management Services Guide" explains the coding criteria  for billing each of the levels as follows.

65.     Initial Consultation **Level 1** -  "problem focused" examination and "straight forward" decision making (15 minutes for outpatient; 20 minutes for inpatient):

///

///

///

///

| *Initial Outpatient Consultation* | *Initial Inpatient Consultation* |
|---|---|
| **Level 1** (CPT 99241): <br> • *problem focused* history: <br> - chief complaint <br> - brief history of the present illness <br><br> • *problem focused* examination: limited examination of the affected body area or organ system <br><br> • *straightforward* medical decision making: <br> - minimal number of diagnoses or management options <br> - minimal or no amount and/or complexity of data to be reviewed <br> - minimal risk of significant complications, morbidity, and/or mortality <br><br> • presenting problem(s) are *self limited or minor* <br><br> • **15 minutes** face-to-face time with the patient | **Level 1** (CPT 99251): <br> • *problem focused* history: <br> - chief complaint <br> - brief history of the present illness <br><br> • *problem focused* examination: limited examination of the affected body area or organ system <br><br> • *straightforward* medical decision making: <br> - minimal number of diagnoses or management options <br> - minimal or no amount and/or complexity of data to be reviewed <br> - minimal risk of significant complications, morbidity, and/or mortality <br><br> • presenting problem(s) are *self limited or minor* <br><br> • **20 minutes** at the bedside and on the patient's hospital floor or unit |

///

///

///

///

///

///

///

///

66.    Initial Consultation **Level 2** - "expanded problem" examination and "straight forward" decision making (30 minutes for outpatient; 40 minutes for inpatient):

| *Initial Outpatient Consultation* | *Initial Inpatient Consultation* |
|---|---|
| **Level 2** (CPT 99242):<br>• *expanded problem* focused history;<br>- chief complaint<br>- brief history of the present illness<br>- problem pertinent review of systems<br><br>• *expanded problem* focused examination: limited examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s)<br><br>• *straightforward* medical decision making:<br>- minimal number of diagnoses or management options<br>- minimal or no amount and/or complexity of data to be reviewed<br>- minimal risk of significant complications, morbidity, and/or mortality<br><br>• presenting problem(s) are of *low severity*<br><br>• **30 minutes** face-to-face time with the patient | **Level 2** (CPT 99252):<br>• *an expanded problem* focused history;<br>- chief complaint<br>- brief history of the present illness<br>- problem pertinent review of systems<br><br>• *expanded problem* focused examination: limited examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s)<br><br>• *straightforward* medical decision making:<br>- minimal number of diagnoses or management options<br>- minimal or no amount and/or complexity of data to be reviewed<br>- minimal risk of significant complications, morbidity, and/or mortality<br><br>• presenting problem(s) are of *low severity*<br><br>• **40 minutes** at the bedside and on the patient's hospital floor or unit |

///

///

///

///

///

///

///

67.     Initial Consultation **Level 3** - "detailed" examination with "low complexity" (40

minutes for outpatient; 55 minutes for inpatient):

| *Initial Outpatient Consultation* | *Initial Inpatient Consultation* |
|---|---|
| **Level 3** (CPT 99243): <br><br> • *a detailed* history <br> - chief complaint <br> - extended history of the present illness <br> - an extended  review of systems <br> - pertinent history of family and/or social <br><br> • *detailed* examination: extended examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s) <br><br> • *low complexity* medical decision making: <br> - limited number of diagnoses or management options <br> - limited amount and/or complexity of data to be reviewed <br> - low risk of significant complications, morbidity, and/or mortality <br><br> • presenting problem(s) are of *moderate severity* <br><br> • **40 minutes** face-to-face time with the patient | **Level 3** (CPT 99253): <br><br> • *a detailed* history <br> - chief complaint <br> - extended history of the present illness <br> - an extended  review of systems <br> - pertinent history of family and/or social <br><br> • *detailed* examination: extended examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s) <br><br> • *low complexity* medical decision making: <br> - limited number of diagnoses or management options <br> - limited amount and/or complexity of data to be reviewed <br> - low risk of significant complications, morbidity, and/or mortality <br><br> • presenting problem(s) are of *moderate severity* <br><br> • **55 minutes** at the bedside and on the patient's hospital floor or unit |

///

///

///

///

///

///

68.     Initial Consultation **Level 4** - "comprehensive" examination with "moderate complexity" (60 minutes for outpatient; 80 minutes for inpatient):

| *Initial Outpatient Consultation* | *Initial Inpatient Consultation* |
|---|---|
| **Level 4** **(CPT 99244):**<br><br>• *a comprehensive* history;<br>- chief complaint<br>- extended history of the present illness<br>- a complete review of systems<br>- complete history of family and/or social<br><br>• *a comprehensive* examination; general multi-system examination OR complete examination of a single organ system and other symptomatic or related body area(s) or system(s)<br><br>• *moderate complexity* medical decision making:<br>- multiple number of diagnoses or management options<br>- moderate amount and/or complexity of data to be reviewed<br>- moderate risk of significant complications, morbidity, and/or mortality<br><br>• presenting problem(s) are of moderate severity;<br><br>• **60 minutes** face-to-face time with the patient. | **Level 4** **(CPT 99254):**<br><br>• *a comprehensive* history;<br>- chief complaint<br>- extended history of the present illness<br>- a complete review of systems<br>- complete history of family and/or social<br><br>• *a comprehensive* examination; general multi-system examination OR complete examination of a single organ system and other symptomatic or related body area(s) or system(s)<br><br>• *moderate complexity* medical decision making:<br>- multiple number of diagnoses or management options<br>- moderate amount and/or complexity of data to be reviewed<br>- moderate risk of significant complications, morbidity, and/or mortality<br><br>• presenting problem(s) are of moderate severity;<br><br>• **80 minutes** at the bedside and on the patient's hospital floor or unit |

///

///

///

///

///

69.    Initial Consultation **Level 5** - "comprehensive" examination with "high complexity"

(80 minutes for outpatient; 110 minutes for inpatient):

| *Initial Outpatient Consultation* | *Initial Inpatient Consultation* |
|---|---|
| **Level 5** **(CPT 99245):**<br><br>• *a comprehensive* history;<br>- chief complaint<br>- extended history of the present illness<br>- a complete review of systems<br>- complete history of family and/or social<br><br>• *a comprehensive* examination; general multi-system examination OR complete examination of a single organ system and other symptomatic or related body area(s) or system(s)<br><br>• *high complexity* medical decision making:<br>- extensive number of diagnoses or management options<br>- extensive amount and/or complexity of data to be reviewed<br>- high risk of significant complications, morbidity, and/or mortality<br><br>• presenting problem(s) are of moderate to high severity;<br><br>• **80 minutes** face-to-face time with the patient. | **Level 5** **(CPT 99255):**<br><br>• *a comprehensive* history;<br>- chief complaint<br>- extended history of the present illness<br>- a complete review of systems<br>- complete history of family and/or social<br><br>• *a comprehensive* examination; general multi-system examination OR complete examination of a single organ system and other symptomatic or related body area(s) or system(s)<br><br>• *high complexity* medical decision making:<br>- extensive number of diagnoses or management options<br>- extensive amount and/or complexity of data to be reviewed<br>- high risk of significant complications, morbidity, and/or mortality<br><br>• presenting problem(s) are of moderate to high severity;<br><br>• **110 minutes** at the bedside and on the patient's hospital floor or unit |

///

///

///

///

70.     Follow Up Inpatient Consultation/Care **Level 1** - "problem focused" examination

(10 minutes through 2005;   20 minutes beginning 2006):

| *"Follow Up Inpatient Consultation" Codes Through 2005* | *"Subsequent Hospital Care" Codes Beginning 2006* |
|---|---|
| <u>**Level 1**</u>  (CPT 99261): <br>• *problem focused* interval history <br><br>• *problem focused* examination: limited examination of the affected body area or organ system <br><br>• *straightforward* or *low complexity* medical decision making <br><br>• patient is stable, recovering or improving <br><br>• **10 minutes** at the bedside and on the patient's hospital floor or unit | <u>**Level 1**</u>  (CPT 99231): <br>• *problem focused* interval history <br><br>• *problem focused* examination: limited examination of the affected body area or organ system <br><br>• *straightforward* or *low complexity* medical decision making <br><br>• patient is stable, recovering or improving <br><br>• **15 minutes** at the bedside and on the patient's hospital floor or unit |

71.     Follow Up Inpatient Consultation/Care **Level 2** - "expanded problem" examination

(20 minutes through 2005;   25 minutes beginning 2006):

| *"Follow Up Inpatient Consultation" Codes Through 2005* | *"Subsequent Hospital Care" Codes Beginning 2006* |
|---|---|
| <u>**Level 2**</u>  (CPT 99262): <br>• *expanded problem focused* interval history <br><br>• *expanded problem* focused examination: limited examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s) <br><br>• *moderate complexity* decision making <br><br>• patient is responding inadequately to therapy or has developed a minor complication <br><br>• **20 minutes** at the bedside and on the patient's hospital floor or unit | <u>**Level 2**</u>  (CPT 99232): <br>• *expanded problem focused* interval history <br><br>• *expanded problem* focused examination: limited examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s) <br><br>• *moderate complexity*  decision making <br><br>• patient is responding inadequately to therapy or has developed a minor complication <br><br>• **25 minutes** at the bedside and on the patient's hospital floor or unit |

72.     Follow Up Inpatient Consultation/Care **Level 3** - "detailed" examination with "low complexity" (30 minutes through 2005;   35 minutes beginning 2006):

| *"Follow Up Inpatient Consultation" Codes Through 2005* | *"Subsequent Hospital Care" Codes Beginning 2006* |
|---|---|
| <u>**Level 3**</u> **(CPT 99263):**<br><br>• *detailed* interval history<br><br>• *detailed* examination: extended examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s)<br><br>• *high complexity* medical decision making<br><br>• patient is unstable or has developed a significant complication or a significant new problem<br><br>• **30 minutes** at the bedside and on the patient's hospital floor or unit | <u>**Level 3**</u> **(CPT 99233):**<br><br>• *detailed* interval history<br><br>• *detailed* examination: extended examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s)<br><br>• *high complexity* medical decision making<br><br>• patient is unstable or has developed a significant complication or a significant new problem<br><br>• **35 minutes** at the bedside and on the patient's hospital floor or unit |

///

///

///

///

///

///

///

///

///

///

73.     Follow Up Outpatient Consultations **Levels 1 - 2:**

| *"Follow Up Outpatient Consultation" Codes* <br><br> *Level 1* | *"Follow Up Outpatient Consultation" Codes* <br><br> *Level 2* |
|---|---|
| <u>**Level 1**</u> **(CPT 99212):** <br> • *problem focused* history <br><br> • *problem focused* examination: limited examination of the affected body area or organ system <br><br> • *straightforward* medical decision making <br><br> • *self limited or minor* presenting problems <br><br> • **10 minutes** face-to-face time with the patient | <u>**Level 2**</u> **(CPT 99213):** <br> • *expanded problem focused* history <br><br> • *expanded problem* focused examination: limited examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s) <br><br> • *low complexity* decision making <br><br> • *low to moderate* presenting problems <br><br> • **15 minutes** face-to-face time with the patient |

74.     Follow Up Outpatient Consultations **Levels 3 - 4:**

| *"Follow Up Outpatient Consultation" Codes* <br><br> *Level 3* | *"Follow Up Outpatient Consultation" Codes* <br><br> *Level 4* |
|---|---|
| <u>**Level 3**</u> **(CPT 99214):** <br> • *detailed* history <br><br> • *detailed* examination: extended examination of the affected body area or organ system and any other symptomatic or related body area(s) or system(s) <br><br> • *moderate complexity* medical decision making <br><br> • *moderate to high severity* presenting problems <br><br> • **25 minutes** face-to-face time with the patient | <u>**Level 4**</u> **(CPT 99215):** <br> • *comprehensive* history <br><br> • *a comprehensive* examination; general multi-system examination OR complete examination of a single organ system and other symptomatic or related body area(s) or system(s) <br><br> • *high complexity* medical decision making <br><br> • *moderate to high severity* presenting problems <br><br> • **40 minutes** face-to-face time with the patient |

75.    For the purposes of these CPT billing definitions, the following body systems are recognized:

- Constitutional symptoms (fever, weight loss, etc.)

- Eyes

- Ears, nose, mouth, throat

- Cardiovascular

- Respiratory

- Gastrointestinal

- Genitourinary

- Musculoskeletal

- Integumentary (skin and/or breast)

- Neurolgical

- Psychiatric

- Endocrine

- Hematologic/lymphatic

- Allergic/immunologic

Centers for Medicare and Medicaid Services (CMS) "Evaluation & Management Services Guide"; Current Procedural Terminology (Standard Edition) 2008, Instructions for Selecting a Level of E&M Service.

76.    As outlined above, the more expanded the examination is, from a *problem focused*, to an *expanded problem focused*, to a *detailed examination*, to a *comprehensive examination*, the higher the CPT billing codes are that should be used.  In most cases for the Physical Medicine and Rehabilitation (PM&R) department at Parkland, residents can only do a **problem-focused** initial consultation, due to a very large number of consults to complete and a shortage of time in which to

complete them.  This is understood and directed by Parkland's PM&R department in its document

"Physical Medicine & Rehabilitation Goals and Objectives" for its residency program:

> "_Inpatient Rehabilitation Objectives_
>
> _Patient Care - The resident will be expected to:_
>
> _Perform a rehabilitation medicine_ **_focused_** _admission history and physical examination_."

*   *   *   *   *

> "_Gym Doctor Service, Medicine & Geriatrics Consult Service, Neurological Surgery_
>
> _Consult Service, Surgery/Neurology Consult Service, Trauma Consult Service Objectives_
>
> _Patient Care - The resident will be expected to:..._
>
> _Perform a rehabilitation medicine_ **_focused_** _admission history and physical examination_."

PM&R Goals and Objective,  pp. 1, 7, 24, 37, 41, 50, 54 (**emphasis** added).  However, the

attending teaching faculty preceptors at Parkland instruct residents to mark _expanded problem_,

_detailed_ or even _comprehensive_ initial history and physical examinations on the encounter (billing)

forms, in addition to marking that the teaching physician was present for the critical or key areas of

the examination.

77.    **4) Billng, and causing false billings for improper Inpatient Rehabilitation**

**Facility ("IRF") stays for patients that did not meet Medicare and Medicaid coverage**

**requirements.**  One result of the Defendants' pervasive ongoing scheme to perform "blind"

consultations and capture new patients for the PM&R department physicians is that oftentimes, the

PM&R department would find patients in Parkland whose primary physician team had made the

medical determination that they should be discharged to nursing homes, long-term acute care

facilities, or discharge to home or family, and would alter those established disposition plans by

instead referring patients for preferential transfer to their PM&R physicians at the PHHS 8 East

IRF and the Zale-Lipshy Hospital. Both of these facilities are Inpatient Rehabilitation Facilities ("IRF").

78.     To meet the medical necessity requirement for coverage in an IRF, the patient must have completed his/her inpatient treatment, and due to the complexity of their rehabilitation needs, must require, tolerate and be reasonably expected to benefit from 3 hours of therapy per day in an inpatient setting from an interdisciplinary team approach to the delivery of rehabilitation care.

79.     The IRF benefit is not to be used for patients who do not require intensive rehabilitation. Federal and State health care benefits are available for such patients in a less-intensive setting. be used as an alternative to completion of the full course of treatment in the referring hospital.

80.     Similarly, a patient who has not yet completed the full course of treatment in the referring hospital is expected to remain in the referring hospital with appropriate rehabilitatitve treatment provided, until such time as the patient has completed the full course of treatment. Patients must be able to fully participate in and benefit from the intensive rehabilitation therapy program provided in IRFs in order to be transferred to an IRF. IRF admissions for patients who are still completing their course of treatment in the referring hospital and who, therefore, are not able to participate in and benefit from the intensive rehabilitation therapy services provided in IRFs are not considered reasonable and necessary.

81.     However, at the urging of PM&R's self-serving consult recommendations, busy and overworked primary care physicians are often mislead to divert established disposition plans prematurely, prior to the completion of the patients' acute care treatment, including appropriate rehabilitative treatment. This is done so that the transfer of patients to PHHS 8 East and to the

Zale-Lipshy Hospital based PM&R IRFs is guaranteed and the patients are not ultimately lost by the PM&R department to their originally intended disposition plans.

82.     In order to intervene and alter the primary physician team's established patient dispositions, the PM&R department deceives both the patient and the primary physician team under the false guise that a primary care team member had originally requested PM&R to consult/assist in good faith in the patient's disposition planning and continuing care.  PM&R's use of this guise suggests that PM&R implicitly understood primary care teams would not knowingly have gone along with these disposition changes in good faith had they realized the rogue nature of the PM&R department's underlying actions and intentions.

83.     Misrepresentation of information by PM&R to primary care physicians compromises the good faith decision making powers of the primary care physicians regarding what is medically necessary in the treatment of their patients.  In order to best serve a patient's health interests and well being and meet the criteria of medical necessity for any medical intervention, a patient's primary care physicians are in the most advantageous and objective position to determine the medical necessity of any medically related decision that affects their patients' treatments and outcomes.  That is only realized if a primary care physician is able to make informed and impartial decisions based on the completeness, reliability, and truthfulness of all information the physician is provided.

84.     **5) Filing and causing the filing of false Cost Reports that included costs for the above false claims.**  To the extent the Defendants falsely billed the above non-covered services and activities to Medicare, Medicaid and other government insured healthcare programs, the related annual and periodic cost reports which served as the basis for the rates of reimbursement by these programs for services rendered by the Defendants were falsely inflated.

85.     Upon information and belief, the Defendants regularly submitted, or caused to be submitted, Hospital Cost Reports to Medicare and Medicaid that were false because (a) they failed to disclose that the Defendants had received reimbursement for non-covered services, and (b) they falsely certified that they had been prepared in accordance with applicable instructions.

86.     By submitting false Hospital Cost Reports, the Defendant Dallas County Hospital District dba Parkland Health and Hospital Systems also evaded its legal obligation to reimburse money to Medicare and Medicaid, and violated the Federal and Texas False Claims Acts.

## VI.  COUNT ONE
### (For Violation of 31 U.S.C. § 3729(a)(1) and (a)(2) and § 3729(a)(1)(A) and (a)(1)(B))
### (Against all Defendants)

87.     *Qui tam* plaintiffs hereby reallege and incorporate herein by this reference paragraphs 1 through 86, inclusive, hereinabove, as though fully set forth at length.

88.     Through their conduct, Defendants have knowingly submitted, or caused to be submitted, false claims for payment, as set forth above, in violation of former statute 31 U.S.C. § 3729(a)(1) and current statute 31 U.S.C. § 3729(a)(1)(A).  Additionally, Defendants have knowingly used, and caused to be used, false records or statements to get false or fraudulent claims paid by the United States, in violation of former statute 31 U.S.C. § 3729(a)(2) and current statute 31 U.S.C. § 3729(a)(1)(B).  As a result of such knowing wrongful conduct the Defendants have caused payments to be made from United States Treasury in the millions of dollars.

## VI.  COUNT TWO
### (For Violation of 31 U.S.C. § 3729(a)(7) and § 3729(a)(1)(G)
### (Against Defendants Dallas County, Texas, the Dallas County Hospital District
### dba Parkland Health and Hospital Systems)

89.     *Qui tam* plaintiffs hereby reallege and incorporate herein by this reference paragraphs 1 through 86, inclusive, hereinabove, as though fully set forth at length.

---

90.     Through their conduct, Defendants have violated and continue to violate former statute 31 U.S.C. § 3729(a)(7) and current statute 31 U.S.C. § 3729(a)(1)(G) by evading their legal obligation to reimburse money to Medicare and Medicaid.

## VII.  COUNT THREE
### (For Violation of Tex. Hum. Res. Code § 36.001 *et seq.*)
### (Against all Defendants)

91.     *Qui tam* plaintiffs hereby realleges and incorporate herein by this reference paragraphs 1 through 86, inclusive, hereinabove, as though fully set forth at length.

92.     Defendants' knowing misconduct as described above is in violation of Tex. Hum. Res. Code § 36.001 *et seq*, and has caused damage to the State of Texas in the millions of dollars.

**WHEREFORE**, *qui tam* plaintiff pray for relief as follows:

1.     Full restitution to the United States and the State Texas of all money damages sustained by each, respectively;

2.     For three times the dollar amount proven to have been wrongfully paid by or withheld from the United States and the State of Texas of all money damages sustained by each;

3.     For maximum civil penalties for all false records, statements, certifications and claims submitted to the United States and the State of Texas, respectively;

4.     For costs of suit, reasonable attorney's fees and the maximum relator share; and

5.     For such other and further relief as the Court deems just and proper.

Donald R. Warren (*pro hac vice*)

---

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished to the

following via first class mail on August 31, 2010:

Sean McKenna, AUSA          Honorable Greg Abbott
1100 Commerce Street        Texas Attorney General
Dallas, Texas 75252-1699    300 W 15th St
                            Austin, TX 78701


*Donald R. Warren*

Donald R. Warren